**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

MARY LOUISE ALLEN,

            Plaintiff,

     v.

STARK STATE COLLEGE, PARA JONES,
LADA GIBSON-SHREVE, THOMAS
CHIAPPINI, ANDREW STEPHAN,
DANETTE LUND, MELISSA GLANZ,
CATHY TORGLER, VICKI BITTINGER,
MARK WELDON, KARI GROH, MERLE
GRIFF, JEFFERY WALTERS, JEFF HALM,
ALICE STEPHENS, FONDA WILLIAMS,
CHRIS MAURER,

            Defendants.

**CASE NO. 5:17-cv-2706 (lead case)**
**CASE NO. 5:18-cv-464**
**CASE NO. 5:18-cv-1545**
**JUDGE JOHN R. ADAMS, PRESIDING**

**PLAINTIFF'S FIRST AMENDED**
**COMPLAINT FOR VIOLATIONS OF:**

(1) TITLE VII OF THE CIVIL RIGHTS
    ACT OF 1964
(2) AMERICANS WITH DISABILITIES ACT
    OF 1990 AND AMERICANS WITH
    DISABILITIES ACT AMENDMENTS
    ACT OF 2008
(3) 42 U.S.C. § 1983
(4) EQUAL PAY ACT OF 1963

[JURY TRIAL DEMANDED]

Plaintiff Mary Louise Allen respectfully pleads the following facts and legal claims before this Court:

## I.     NATURE OF THE ACTION

1.     Plaintiff Mary Louise Allen ("Plaintiff" or "Allen") was popular, highly effective psychology professor at Stark State College who became a persistent advocate in reporting discrimination, harassment, retaliation, and other legal and ethical concerns to her employer. She has paid a very heavy price for doing so. As a consequence of Defendants' unlawful actions, she has experienced loss of employment, career opportunities, personal finances, and personal reputation, and has suffered significant emotional distress and health impairments.

2.     Accordingly, Plaintiff brings this First Amended Complaint for sex discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.; disability discrimination and retaliation pursuant to the Americans with Disabilities Act of 1990,

42 U.S.C. § 12101 *et seq.* (incorporating the Americans with Disabilities Act Amendments Act of 2008); denials of Constitutional rights under the First and Fourteenth Amendments pursuant to 42 U.S.C. §1983; and sex-based inequality in compensation pursuant to the Equal Pay Act, 29 U.S.C. §206(d) *et seq.* The parties, underlying factual allegations, legal claims (with specific defendants indicated for each), and requested relief are provided below.

## II.  BRIEF PROCEDURAL HISTORY

3.      On December 29, 2017, Plaintiff filed her first action, *Mary Louise Allen v. Stark State College, et al.* (Case No. 5:17-cv-2706), alleging sex and disability discrimination and retaliation.

4.      On February 27, 2018, Plaintiff filed her second action, *Mary Louise Allen v. Stark State College, et al.* (Case No. 5:18-cv-464), alleging further sex and disability discrimination and retaliation, culminating in Plaintiff's wrongful termination.

5.      On July 9, 2018, Plaintiff filed her third action, *Mary Louise Allen v. Stark State College, et al.* (Case No. 5:18-cv-1545), alleging denials of Constitutional rights pursuant to 42 U.S.C. §1983 and sex-based inequality in compensation.

6.      On July 23, 2018, this Court ordered all three actions consolidated and directed Plaintiff, now represented by counsel granted *pro hac vice* admission by the Court, to file a First Amended Complaint covering all three actions within 14 days, to be administratively designated as Case No. 5:17-cv-2706.

## III.  PARTIES

7.      Plaintiff Mary Louise Allen, a female, worked as a psychology professor at Defendant Stark State College on a full-time, renewable contract basis from 2009 until 2016, when she was terminated.

8.      All defendants specified herein are "persons" within the meaning of 42 U.S.C. § 1983.

9.      Defendant Stark State College ("Stark State"), named in all claims for relief below, is a two-year, public college, with its primary campus located in Stark County, Ohio. Operating

under color of state law during the events in question, it is subject to liability under 42 U.S.C. §1983.

10.    Defendant Stark State College is an "employer" within the meaning of the Equal Pay Act, Title VII of the Civil Rights Act of 1964, and the Americans with Disabilities Act Amendments Act of 2008. It employed a minimum of 15 employees throughout the period covered by this action.

11.    Defendant Para Jones ("Jones") is the president of Stark State College and was acting under color of state law during the events in question. She is being sued in her personal capacity under 42 U.S.C. §1983.

12.    Defendant Lada Gibson-Shreve ("Gibson-Shreve") is the provost and a former dean at Stark State College and was acting under color of state law during the events in question. She is being sued in her personal capacity under 42 U.S.C. §1983.

13.    Defendant Thomas Chiappini ("Chiappini") is the vice president of Stark State College and was acting under color of state law during the events in question. He is being sued in his personal capacity under 42 U.S.C. §1983.

14.    Defendant Andrew Stephan ("Stephan") is a dean at Stark State College and was acting under color of state law during the events in question. He is being sued in his personal capacity under 42 U.S.C. §1983.

15.    Defendant Danette Lund ("Lund) is a department chair at Stark State College and was acting under color of state law during the events in question. She is being sued in her individual capacity under 42 U.S.C. §1983.

16.    Defendant Melissa Glanz ("Glanz") is the human resources director at Stark State College and was acting under color of state law during the events in question. She is being sued in her personal capacity under 42 U.S.C. §1983.

17.    Defendant Cathy Torgler ("Torgler") is a human resources generalist at Stark State College and was acting under color of state law during the events in question. She is being sued in her personal capacity under 42 U.S.C. §1983.

18.     Defendant Vicki Bittinger ("Bittinger") is a human resources generalist at Stark State College and was acting under color of state law during the events in question. She is being sued in her personal capacity under 42 U.S.C. §1983

19.     Defendant Mark Weldon ("Weldon") is the campus security chief at Stark State College and was acting under color of state law during the events in question. He is being sued in his personal capacity under 42 U.S.C. §1983.

20.     Defendant Kari Groh ("Groh") is a member of the Stark State College Board of Trustees and was acting under color of state law during the events in question. She is being sued in her personal capacity under 42 U.S.C. §1983.

21.     Defendant Merle Griff ("Griff") is a member of the Stark State College Board of Trustees and was acting under color of state law during the events in question. She is being sued in her personal capacity.

22.     Defendant Jeffery Walters ("Walters") is a member of the Stark State College Board of Trustees and was acting under color of state law during the events in question. He is being sued in his personal capacity under 42 U.S.C. §1983.

23.     Defendant Jeff Halm ("Halm") is a member of the Stark State College Board of Trustees and was acting under color of state law during the events in question. He is being sued in his personal capacity under 42 U.S.C. §1983.

24.     Defendant Alice Stephens ("Stephens") is a member of the Stark State College Board of Trustees and was acting under color of state law during the events in question. She is being sued in her personal capacity under 42 U.S.C. §1983.

25.     Defendant Fonda Williams ("Williams") a member of the Stark State College Board of Trustees and was acting under color of state law during the events in question. He is being sued in his personal capacity under 42 U.S.C. §1983.

26.     Defendant Chris Maurer ("Maurer") is a member of the Stark State College Board of Trustees and was acting under color of state law during the events in question. He is being sued in his personal capacity under 42 U.S.C. §1983.

## IV.  JURISDICTION AND VENUE

27.    This Court has jurisdiction of Plaintiffs' federal law claims pursuant to 28 U.S.C.

§ 1331, as this case involves questions of federal law, and 42 U.S.C. § 2000e-5(f)

28.    Venue is proper in, and Defendants are subject to the personal jurisdiction of, this

District because Defendant Stark State College maintains facilities and business operations in

this District, the individually named Defendants work and/or reside in this District, and all or

most of the events giving rise to this action occurred in this District. 28 U.S.C. § 1391(b); 42

U.S.C. § 2000e-5(f)(3).

## V.  EXHAUSTION OF REMEDIES

29.    Plaintiff's filing of *Mary Louise Allen v. Stark State College, et al.* (Case No.

5:17-cv-2706) was authorized by a right-to-sue letter issued by the Equal Employment

Opportunity Commission, received on October 2, 2017. This action originated from a charge

timely filed with the EEOC in September 2014.

30.    Plaintiff's filing of *Mary Louise Allen v. Stark State College, et al.* (Case No 5:18-

cv-464) was authorized by a right-to-sue letter issued by the Equal Employment Opportunity

Commission, received on December 4, 2017. This action originated from a charge timely filed

with the EEOC in May 2017.

## VI.  STATEMENT OF FACTS

### Plaintiff's Employment and Medical History

31.    In 2009, Plaintiff was hired by Stark State as a full-time, contract-based faculty

member, teaching psychology courses in the social sciences department. At the time of hiring,

Plaintiff possessed a master's degree in psychology from Kent State University, a regionally

accredited institution, and was in the process of completing her Ph.D. in psychology from Kent

State.

32.    During her period of employment with Stark State, Plaintiff performed her

teaching responsibilities at a high level of proficiency, consistently earning excellent teaching

evaluations from students and renewable, multi-year teaching contracts. Her anonymous written

student evaluations were regularly peppered with superlatives such as "amazing teacher," "best class I ever had," "puts so much extra time into the class," "always prepared, never tardy, never absent," "always available," "great professor," "best professor," "didn't want it to end," "great detailed lessons," "invested in our learning," "drilled important information; thank you," "always answering emails or texts back to students," and "wish all professors were like her." She also was nominated for teaching excellence awards on multiple occasions.

33.     Plaintiff received strong annual reviews from her supervisors, at least until she began to report discrimination, harassment, and other legal and ethical concerns stemming from the work environment and personnel decisions at Stark State. In addition, until this juncture, she was regularly given extra teaching sections, known as overloads, in return for additional compensation, and was promoted from instructor to assistant professor.

34.     At the time of her 2016 termination, Plaintiff was a public employee with a two-year employment contract "conditioned upon satisfactory performance of [her] job duties," subject to the rules, regulations, policies, and procedures of Stark State College and sufficient budgetary funding by the legislature. Plaintiff's previous three-year, fixed-term employment contracts contained virtually identical language concerning the terms and conditions of employment. Neither Plaintiff's fixed-term contract nor the Stark State College policies and procedures manual contained any language specifying that full-time contract faculty are hired and retained on an at-will basis.

35.     Plaintiff is a victim of childhood physical, sexual, and emotional abuse and was receiving counseling and treatment for Complex Post-Traumatic Stress Disorder (Complex PTSD) throughout the time covered by this litigation. In addition, in 2015, Plaintiff was sexually and physically assaulted by her fiancé, which exacerbated her trauma symptoms and caused her to seek out additional care. These symptoms worsened when her assailant sued her for defamation in response to her contacting lawyers and social services agencies in search of legal and mental health assistance.

36.     Complex PTSD is associated with child abuse (sexual, physical, emotional),

intimate partner abuse, bullying, and other forms of prolonged mistreatment. *See* JUDITH
HERMAN, M.D., TRAUMA AND RECOVERY: THE AFTERMATH OF VIOLENCE—FROM DOMESTIC
ABUSE TO POLITICAL TERROR (1997). Its symptoms can include, among others, lasting feelings of
terror and helplessness, as well as depression, especially in an acute state. *See id.* Severe trauma
frequently impairs normal brain functioning, including a deactivation of logical thinking
capabilities and a hyper-activation of emotional expression, especially fear and distress. *See*
BESSEL VAN DER KOLK, M.D., THE BODY KEEPS THE SCORE: BRAIN, MIND, AND BODY IN THE
HEALING OF TRAUMA (2015).

37.     At times, the effects of Complex PTSD, including long and severe bouts with
depression and anxiety, have made it very difficult for Plaintiff to advocate for her work and
legal interests, especially once her employment situation at Stark State began to deteriorate and
even more so after she experienced the sexual and physical assaults in 2015.

**Sex Discrimination, Harassment, and Retaliation concerning Marc Hostetler**

38.     When she was hired in 2009, Plaintiff assumed administrative responsibilities as the
Psychology/Political Science Coordinator in addition to her teaching assignments. From very early
on, her immediate supervisor and department chair, Marc Hostetler, used daily check-in
requirements to regularly single out Plaintiff for unwarranted criticism. He would threaten
Plaintiff's job security, distort previously established deadlines, chide her for student evaluations
that were statistically excellent, question how much time she spent on campus (despite that she
regularly spent over 50 hours a week on campus), and accused her of awarding too many high
grades (despite that her grading patterns ranked third or fourth among six instructors in her group).

39.     From 2009-12, Plaintiff repeatedly attempted to resolve these matters informally via
her dean (later to become provost) Lada Gibson-Shreve, and the Stark State Human Resources
office, citing sex discrimination and harassment by Hostetler. Unable to make progress, she
resigned her coordinator position in hopes that it would end Hostetler's targeted behaviors toward
her.

40.     Unfortunately, Hostetler's targeting of Plaintiff would continue, and in 2013, she

filed a formal internal complaint against him with Human Resources, citing sex-based discrimination and harassment.

41.     After filing her complaint about Hostetler's actions and behavior, Plaintiff began to experience retaliation, including: (a) After four years of excellent personnel evaluations, Hostetler called Plaintiff "insubordinate" in response to her complaint against him and began discrediting her with her colleagues; (b) Hostetler and faculty member Bryan Gerber began exchanging e-mails about Plaintiff titled "More Hilarity"; (c) Gerber sent Plaintiff hostile e-mails defending Hostetler and copied all departmental colleagues; (d) another Coordinator began excluding Plaintiff from work-related, departmental e-mails normally sent to all faculty; (e) Plaintiff found herself blocked from opportunities to serve on college committees and to teach Student Success courses.

42.     From this point onward, Stark State administrators would repeatedly invoke the tag of "insubordinate" in response to Plaintiff's efforts to assert her rights and report discriminatory practices.

43.     In another retaliatory incident in 2013, while Plaintiff's complaint was pending, Hostetler encouraged a disgruntled student, one whose angry behavior towards other faculty had already required intervention by campus security, to file a grievance against Plaintiff concerning a grading dispute. Dean Stephan admonished Hostetler that he was not using the correct procedure to process the grievance, but Hostetler persisted. Plaintiff begged Human Resources to intervene and to provide her with a different supervisor, but Human Resources refused her requests.

44.     In January 2014, Plaintiff met with Vicki Bittinger from Human Resources to discuss the findings regarding her formal complaint concerning Hostetler. Bittinger informed her that although they did find "generational and gender insensitivities" in Hostetler's treatment of Plaintiff, they did not find any retaliation by him in response to Plaintiff's complaint. Plaintiff, reiterating her concerns about retaliation, citing Hostetler's recent allegation of insubordination, and referencing a forthcoming annual evaluation, again asked to be assigned to a new supervisor. Human Resources refused her request.

45.     In March 2014, at a regularly scheduled social sciences department meeting at which

Plaintiff and other faculty were present and over which Hostetler presided, Hostetler responded to Plaintiff's formal complaint to Stark State College of discrimination, harassment, and retaliation and the Human Resources findings in response to it. He urged his colleagues, all over whom he had supervisory authority, to collectively write a letter to Human Resources, supporting him in his efforts to remove the "black mark/label" of the investigation from his personnel record. In addition, he discouraged his colleagues from making any further reports concerning conditions of work to Human Resources. In contravention of normal departmental practices, no official minutes were taken at the meeting. Plaintiff, however, audio-recorded the proceedings.

46.     The day after the department meeting, Plaintiff met with human resources director Melissa Glanz and informed her of what had transpired. Glanz requested a copy of the audio recording of the meeting, which Plaintiff promptly provided. As part of an apparent investigation into Hostetler's conduct, human resources would later ask Plaintiff for a witness statement, which Plaintiff also provided.

47.     That same day, Hostetler followed Plaintiff into the faculty parking lot, in what Plaintiff perceived as an attempt to intimidate her. Hostetler returned to the Stark State building upon seeing Dean Stephan.

48.     Hostetler's public criticism of Plaintiff signaled to those under his supervision that Plaintiff was an officially disfavored individual in the department. This ploy worked, as Plaintiff would experience ongoing ostracism from her colleagues from then on. No College administrator publicly defended her right to file an internal complaint.

49.     After multiple pleas from the Plaintiff, Stark State College eventually removed Hostetler as her supervisor. Stark State College later removed him as department chair following a human resources investigation concerning his conduct, but allowed him to retain his teaching position that allowed him to earn substantially the same salary.

50.     Even after Hostetler's removal as Plaintiff's supervisor and department chair, Plaintiff continued to experience retaliation at Stark State College. Most notably, Stark State refused to give Plaintiff any overload classes (resulting in loss of approximately $20,000 in annual income),

9

while giving maximum overloads to all other full-time faculty in her department who requested them, including Hostetler. In fact, Plaintiff's public records requests yielded an e-mail from department chair Danette Lund to dean Andrew Stephan, suggesting that Plaintiff would not be able to find out that overload classes could have been assigned to her.

51.     Furthermore, the pattern of omitting Plaintiff from work-related e-mail communications continued; for example, as a result of these omissions, she missed a mandatory departmental meeting and missed a deadline to submit a request for professional development funds. Interestingly, department chair Danette Lund did not contact Plaintiff regarding her absence.

52.     The stress and anxiety from this situation ultimately caused Plaintiff to take a one-semester leave of absence, using her accumulated sick days, in the Fall of 2014.

53.     Plaintiff filed a formal complaint against Stark State College with the Equal Employment Opportunity Commission in 2014, citing these events.

### Reasonable Accommodation Requests

54.     During early 2014, the stress, fear, and anxiety of dealing with Hostetler's retaliation, his now frequent practice of criticizing the Plaintiff among other faculty and administrators within a physically concentrated workspace, and Stark State's response to Plaintiff's reported concerns, combined to worsen her symptoms associated with Complex PTSD.

55.     Accordingly, Plaintiff sought additional treatment possibilities. Her doctor recommended promising treatment programs that would require Plaintiff to be available to participate on certain days and times of the week.

56.     In February 2014, roughly a week before the department meeting at which Hostetler criticized the Plaintiff for filing a formal complaint against him, Plaintiff made a reasonable accommodation request to Stark State College for a Fall 2014 teaching schedule that would enable her to participate in any of the trauma treatment programs, while continuing to fulfill her essential teaching and other faculty responsibilities. This request was for a schedule identical to teaching schedules that she had been given in previous years, even without a reasonable accommodation request.

57.     Stark State College refused to grant Plaintiff's request for a reasonable accommodation. Instead, the college gave her a teaching schedule that precluded her participation in any of the trauma treatment programs. When Plaintiff asked Dean Andrew Stephan how her request could be construed as an undue hardship under disability discrimination law, Stephan would only say that it was a "College decision" and would not engage her in an interactive process concerning her request.

58.     From this time onward, and continuing through her July 2016 termination, Plaintiff made reasonable accommodation requests for a teaching schedule options that would both enable her to participate in any of the trauma treatment programs and allow her to fulfill her essential teaching and other faculty responsibilities. In every instance, she requested a teaching schedule like those that Stark State College had given her even without such a request, but before she made a formal complaint about her supervisor and department chair, Marc Hostetler. In one example, the College presented her with four possible teaching schedules, all of which required her to teach on the very day that she needed keep free for the treatment programs. During this time, the College also made unnecessarily burdensome and intrusive medical requests.

59.     Plaintiff's need to obtain treatment for Complex PTSD and associated symptoms became considerably more acute in the spring of 2015, when she was the victim of sexual and physical assaults by her fiancé. Her health became even more impaired when the assailant sued her for defamation after she began discussing the assaults with local attorneys and social services agencies who might provide her with legal advice and victim assistance.

60.     During the time period in question, Stark State College offered approximately 70 sections of psychology courses each semester, including both classroom and online formats, to be taught by six full-time faculty and a larger number of adjunct faculty hired on an as-needed basis. Stark State College typically gave full-time faculty members priority in selecting classes to teach, and it routinely granted format and scheduling preferences, even without a reasonable accommodation request. Dean Andrew Stephan and department chair Danette Lund had primary decision making authority over course scheduling and faculty teaching assignments.

61.     Internal Stark State College communications (obtained by Plaintiff via a public records request) coinciding with the period during which Plaintiff made her reasonable accommodation requests indicate that Stark State engaged in repeated efforts to deny her opportunities to participate in any of the trauma treatment programs, including refusing Plaintiff's offer to reduce course overloads and to use personal days.

### Bryan Gerber's Credentials and Pay Inequality

62.     When Plaintiff was hired by Defendant Stark State College, Bryan Gerber (male), Nicole Cleland, Martina Sharp-Greer, and Natashia Willmott (all female) were also hired as full-time, contract-based psychology faculty in the social sciences department.

63.     Bryan Gerber possessed a master's degree in psychology and Psy.D. from California Coast University, which at the time was an unaccredited institution, per a 2004 U.S. Congressional Government Accountability Office report.

64.     Psychology faculty hired at the same time as Plaintiff and Gerber, all of whom are women, possessed at least a regionally accredited master's degree in psychology or related discipline.

65.     Full-time psychology teaching positions at Stark State required at least a master's degree in psychology or a related discipline from a regionally accredited college or university.

66.     In 2011, Plaintiff and other colleagues learned of Gerber's unaccredited graduate degrees and reported this information to Defendant Stark State College. Plaintiff also reported to Stark State College administrators that Gerber's office door name sign erroneously identified him as a Ph.D., although his unaccredited doctorate was a Psy.D. Nevertheless, for years Stark State College continued to permit Gerber to keep an office door name sign indicating that he was the holder of a Ph.D, thus potentially misleading students as to a professor's credentials.

67.     In 2015, Plaintiff learned that she had been earning a lower base salary than Gerber throughout their years of employment. She reported her concerns to Defendant Stark State College through contact with vice president Thomas Chiappini, human resources director Melissa Glanz, human resources generalist Vicki Bittinger, dean Andrew Stephan, president Para

Jones. Chiappini and Glanz were the two senior administrators primarily responsible for determining faculty salaries, subject to Jones's review.

68.     HR director Glanz responded to Plaintiff by saying that Gerber had negotiated a higher base salary. Plaintiff was not given such an opportunity at the time of her hiring, nor was she afforded this opportunity even after she brought her concerns about salary inequality to the attention of Stark State College administrators.

69.     Plaintiff would later learn that all women social sciences faculty who were hired on a full-time, contract basis the same year as Gerber earned lower base salaries than he did.

70.     During the time period in question, the base salaries for Plaintiff, Gerber, and other women psychology faculty hired with them covered substantially similar, if not identical, job descriptions, duties, and teaching loads, and required substantially similar skills and qualifications.

71.     Following the reporting of Gerber's unaccredited graduate degrees by several members of the Stark State faculty, the Stark State administration gave him an opportunity to complete a regionally accredited master's degree in psychology.

72.     After Plaintiff's internal reports of Gerber's unaccredited and the false degree credentials on his office nameplate, in 2015 Gerber filed a formal internal harassment complaint against her, followed by a 2016 defamation claim. Gerber was represented by attorney Laura Mills, the same lawyer representing Plaintiff's assailant in his defamation claim against her concerning the sexual and physical assaults.

73.     Plaintiff's public records requests have yielded e-mails between attorney Mills and attorney Michael McPhillips of the state Attorney General's office (who was providing Stark State with legal advice about Plaintiff's allegations), as well as e-mails between Stark State administrators acknowledging problems with Gerber's degree credentials.

### Events Leading to Termination

74.     From early 2015 through July 2016, Plaintiff reiterated her complaints about discrimination and retaliation, renewed her reasonable accommodation requests, and filed

associated internal complaints through authorized channels. Often these complaints reported an accumulation of retaliations, such as being singled out for parking violations and being forced to readmit into her class a student whom Allen dropped from the course roster consistent with federal financial guidelines. She continued to express her concerns with, and objections to, inadequate findings and investigations by Stark State. She also repeatedly contacted Stark State administrators, including president Para Jones, about systemic issues of differential, discriminatory treatment of women faculty in general.

75.     During this period of time, Stark State College administrators engaged in repeated, frivolous efforts to call Plaintiff into meetings, often with only a day's notice, in which they acknowledged the possibility of disciplinary measures being imposed. When Plaintiff would ask for details about the subject matter supporting the possible discipline, Stark State usually refused to provide with her such specifics, saying only that they would be discussed at the meeting. This pattern of evasive exchange by Stark State administrators and human resources personnel would continue and escalate throughout the rest of Plaintiff's history of employment at Stark State.

76.     In response to Plaintiff's ongoing expressions of concern, Stark State administrators escalated the tone and content of their responses to Plaintiff, citing alleged violations of the Stark State Policies and Procedures Manual as grounds for written reprimands. A December 2015 letter from vice president Thomas Chiappini to Plaintiff listed subjects of Plaintiff's complaints that were now deemed "closed" by the college administration, including allegations of more favorable treatment of male employees. The letter informed Plaintiff that further internal communications on these matters would "be considered insubordination and may result in disciplinary action."

77.     None of these reprimands criticized the quality or content of Plaintiff's classroom teaching; all emanated from Plaintiff's actions regarding complaints she had made about discrimination, retaliation, and other legal and ethical concerns.

78.     Starting in January 2015, Plaintiff began attending and sometimes speaking at open public board meetings of the Stark State College Board of Trustees. She took this route relying in part on advice from Governor John Kasich's office in response to her query expressing exasperation

with Stark State's inadequate responses to her concerns about discrimination and inequality and threats of adversarial employment actions.

79.     In March 2016, Plaintiff addressed the Trustees at an open public board meeting about the negative work experiences of women faculty and administrators at Stark State, quoting passages of exit letters that she had obtained via a public records request. For example, one former female employee said she resigned due to her declining "physical and mental health," having been advised by four health care professionals that "no job is worth my health." This woman "feared for [her] safety from the angry outbursts" of a Stark State male co-worker, adding that vice president Chiappini refused to allow her to transfer to a different department. Overall, Plaintiff spoke to the "chilling effect climate" for female employees at Stark State.

80.     Immediately after the board meeting, Plaintiff was physically cornered by vice president Chiappini, escorted to a dimly lit, adjoining room, and served with a letter informing her that because of her actions, she was receiving a one-week unpaid suspension. Provost Gibson-Shreve blocked the door during this detention. Plaintiff also was informed by dean Andrew Stephan that her three-year employment contract was being reduced to a term of two years.

81.     Plaintiff learned via a public records request that, around this time, a male faculty member with a history of sexual harassment was given a one-day unpaid suspension.

82.     After this encounter, Plaintiff immediately e-mailed president Para Jones and asked her to appeal the suspension. Jones quickly and repeatedly denied her request.

83.     Plaintiff also asked Stark State to schedule the suspension for the week of spring break, in order to avoid a disruption of her classes that would require other faculty to fill in for her. That request was ignored. (By contrast, when department chair Hostetler was suspended for wrongful behaviors toward Plaintiff and others, his suspension was allowed to commence after he had submitted his final semester grades.)

84.     The trauma and anxiety of this series of events and interactions caused Plaintiff to take a leave of absence for the remainder of the semester.

85.     In a letter dated May 31, 2016, provost Lada Gibson-Shreve notified Plaintiff that

she was being placed on paid administrative leave, accompanied by a list of restrictions including this one: "Shall refrain from communicating with Stark State College faculty/staff and vendors about College business during regular business hours."

### List of (Approximately) 3,000 Vendors

86.     In response to Gibson-Shreve's directive that Plaintiff must "refrain from communicating with Stark State College faculty/staff **and vendors** about College business during regular business hours" (emphasis added), Plaintiff asked Gibson-Shreve to explain what institutions were included on the list. Gibson-Shreve replied, attaching a list of *approximately 3,000 current vendors* of Stark State College, including area businesses, government entities, and non-profit agencies. The list included:

- Numerous area health care providers, counselors, clinics, and hospitals in the area, including the Aultman Hospital, where her doctor was housed, and other facilities whose treatment programs Plaintiff had sought to participate;

- Numerous non-profit service agencies, including The Domestic Violence Project, Inc., American Red Cross, United Way, and other crises and disability services;

- Numerous area churches and spiritual institutions;

- Numerous public safety and emergency services, such as police departments;

- Numerous courts in the county, including (1) Canton Municipal Court, where Plaintiff had a pending creditor proceeding that she was not able to attend because it would have required discussing the financial impact of her employment disputes with Stark State College, which, in turn, prompted a default finding that led her into further psychological decline and a court-ordered lien emptying her bank account; and (2) Stark County Clerk of Courts office, where Plaintiff had two defamation claims where she was now representing herself in a *pro se* capacity.

- Local and state government entities, elected and appointed public officials, public administrative bodies, and educational accreditation agencies;

- Many local attorneys, including some whom Plaintiff had considered contacting for

legal advice;

- Many banks and financial institutions, including Plaintiff's own bank, KeyBank;

- Benefit and insurance companies, including the Plaintiff's own benefit and insurance plans: Impact Solutions, Stark County Schools health insurance plans, and the State Teachers Retirement System of Ohio;

- Numerous local, state, and even out-of-state colleges and universities;

- Local employment outreach and employee assistance services; and,

- Virtually all area newspapers.

87.      This directive, which would remain in place until Plaintiff's July 11, 2016 termination, harshly impacted Plaintiff, cutting her off from potential sources of counseling, care, support, advising, information, financial resources, public safety services, legal and other advice, and the justice system. It exacerbated her Complex PTSD and undermined her ability to assess, respond, and advocate for her situation at a time when she knew her employment status was perilous.

### Termination

88.      The June 2016 period overlapping with Plaintiff's mandated administrative leave was marked by a series of communications between Plaintiff and Human Resources administrators, during which the latter attempted to schedule a "due process hearing" with Plaintiff that, they informed her, could lead to disciplinary action, including termination.

89.      At this juncture, Plaintiff's overall mental health was in an acute state, and she was attempting to extend her leave of absence using accumulated sick days. However, because she was prohibited from accessing the employee online portal, she could not obtain the needed forms online. Her repeated requests to Human Resources for these leave forms went unheeded.

90.      Stark College administrators scheduled a June 14 due process hearing, but did not supply Plaintiff with specific factual allegations. Plaintiff informed them that she was too ill to attend, and the hearing was postponed.

91.      On June 17, Human Resources then informed Plaintiff that the due process hearing

would be held on June 22. Plaintiff cited a scheduling conflict due to outstanding litigation (facing defamation claims from both her assailant and Bryan Gerber). On June 20, Human Resources informed Plaintiff that the hearing would proceed on June 22, adding that if she could not attend, then she could provide a written response to Stark State's allegations. Plaintiff had yet to see Stark State's specific allegations.

92.     Plaintiff was too ill to attend the June 22 hearing. She informed Human Resources that morning that she would be taking a contractually afforded sick day. At approximately 9:00 a.m., Human Resources informed Plaintiff that she had until 10:30 a.m. to submit her response to Stark State's allegations. However, Plaintiff still had not received these allegations, despite repeated requests.

93.     On June 22, 2016, Stark State College went ahead with the due process hearing, which Plaintiff was unable to attend.

94.     Between June 22 and July 11, 2016, Plaintiff made repeated requests to Human Resources to be informed about the results of the June 22 hearing. Human Resources did not respond to these requests.

95.     In a letter dated July 11, 2016 and signed by dean Andrew Stephan and human resources specialist Cathy Torgler, Stark State College informed Plaintiff that she was being terminated for violations of her contract and for violations of the Stark State College Policies and Procedures Manual:

- "3357:15-14-04, Employee Responsibilities and Duties: 'It is expected that all employees will accept appropriate responsibility assigned to them and cooperate through the timely completion of assigned work or duties as outlined within the applicable job description.'"

- "Code of Ethics and Professional Behavior (3357:15-14-27), Guiding Principles of Professional Behavior, (A) Principle I – Autonomy (6) states 'We hold ourselves and other accountable and accept responsibility for our decisions and behavior.'; (B) Principal II – Non-Malfeasance: We pledge to do no harm; Principle IV – Justice (3)

18

states 'We eliminate barriers that impede student learning and development…'."

96.     Upon receiving her notice of termination, Plaintiff immediately requested a post-termination appeal. Human resources director Melissa Glanz quickly denied her request, claiming that because Plaintiff was no longer a Stark State employee, she was not entitled to an internal review of the decision.

97.     Plaintiff's termination was subject to approval by Stark State College president Para Jones and by the Stark State board of trustees.

98.     Upon receiving her notice of termination, Plaintiff wrote to members of the Stark State College board of trustees, informing them of the circumstances that led to her wrongful termination and asking them not to ratify the decision made by the college administrators.

99.     At a summer 2016 Stark State board meeting at which trustees Kari Groh, Merle Griff, Jeffery Walters, Jeff Halm, Alice Stephens, Fonda Williams, and Chris Maurer were present, Plaintiff's termination was approved.

100.    During her period of employment and its aftermath, Plaintiff attempted to file legal claims concerning Stark State's working conditions and disciplinary actions with the Ohio State Personnel Board of Review (SPBR). This possibility turned out to be illusory, for after months of purportedly deliberating upon her claims, the Board simply held that it lacked jurisdiction to hear them.

**Mark Weldon's Post-Termination Report to Local Police**

101.    During the 2015 sexual and physical assaults by her fiancé, Plaintiff managed to make contemporaneous audio recordings that included verbally threatening statements by the assailant. This man was well known to people at Stark State College because of his relationship with the Plaintiff and his standing in the community as an attorney with a well-known law firm. After the assaults, Plaintiff had received a report that her assailant was overheard plotting with a Stark State College official about how to terminate Plaintiff's employment. Fearful for her safety on campus, Plaintiff shared the recordings of the assaults with Stark State College officials, including Stark State campus security chief Mark Weldon, a former police captain.

19

102.    In 2017, while Plaintiff's discrimination claims against Defendant Stark State College were pending before the Equal Employment Opportunity Commission, Defendant Weldon contacted the Jackson Township police department and filed a complaint against Plaintiff, citing her assailant's audio recorded threats to her during the 2015 assaults but mischaracterizing them as being the *Plaintiff*'s threats to Stark State College.

103.    During this time, Plaintiff was also engaged in civil litigation with her assailant concerning the assaults and with Stark State faculty member Bryan Gerber, while continuing to receive treatment for psychological trauma.

**Plaintiff's Losses**

104.    As a consequence of Defendant's actions, Plaintiff has suffered the following personal, employment, financial, and health damages and losses:

- Loss of employment, income, health care coverage, and retirement funding;
- Loss of savings, credit worthiness, and financial flexibility;
- Severe harm to educational, career, and professional options and trajectories;
- Significant injury to personal and professional reputation;
- Severe pain and suffering, emotional distress, fear, and anxiety;
- Exacerbated physical and psychological health impairments associated with Complex PTSD;
- Significant legal expenses.

**VII.  PLAINTIFF'S CLAIMS UNDER TITLE VII AND ADA/ADAAA**

**Count I**
**Title VII**
**Sex Discrimination**
**Defendant: Stark State**

105.    Plaintiff incorporates by reference as if fully set forth herein allegations contained in the preceding paragraphs.

106.    Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on

the basis of race, color, religion, sex, and national origin. 42 U.S.C. § 2000e *et seq*.

107.    Plaintiff, a female, is alleging discrimination on the basis of sex and thus pleads her case as a member of a Title VII-protected class. As indicated above, Plaintiff was had the requisite credentials for the job and was performing more than satisfactorily as a psychology professor.

108.    Despite her qualifications and job performance, Plaintiff was terminated from her employment in July 2016. As explained above, her termination exceeded the discipline (or lack thereof) imposed upon male faculty members, including Marc Hostetler and Bryan Gerber, for their reported transgressions.

109.    Accordingly, as a direct and proximate result of Stark State's unlawful employment practices and disregard for Plaintiff's rights and dignity, she has lost and will continue to lose income, benefits, and other compensation, as well as endure considerable emotional distress.

**Count II**
**ADA/ADAAA**
**Failure to Reasonably Accommodate**
**Defendant: Stark State**

110.    Plaintiff incorporates by reference as if fully set forth herein allegations contained in the preceding paragraphs.

111.    The Americans with Disabilities Act of 1990 (ADA), prohibits, among other things, employment discrimination against a "qualified individual" with a disability because of that disability. 42 U.S.C. § 12101. A qualified individual is someone who can perform the "essential functions" of the job with or without a "reasonable accommodation." A requested accommodation is not considered reasonable if the employer can establish that it constitutes an "undue hardship."

112.    The term "disability" means "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an

impairment; or (C) being regarded as having such an impairment…." 42 U.S.C. § 12102(1).

113.    The Americans with Disabilities Act Amendments Act of 2008 (ADAAA) amended and expanded the definitions of "disability" under the ADA to cover impairment of "major life activities" to include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working," as well as the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12101(2).

114.    A "modified work schedule" is among the listed reasonable accommodations under the ADA. 42 U.S.C. § 12111(9)(B).

115.    Plaintiff has been receiving treatment for Complex Post-Traumatic Stress Disorder throughout the time covered by this litigation. Her symptoms have included impairment of major life activities, including, but not limited to, long and severe bouts of depression, fear, and anxiety, interference with eating and sleeping, and negative effects on neurological and brain functioning. Accordingly, Plaintiff's Complex PTSD is a qualifying disability under the ADA and the ADAAA.

116.    Beginning in 2014 and continuing through her termination, Plaintiff made requests for an extraordinarily modest reasonable accommodation concerning her teaching schedule, which, if provided, would have enabled her to participate in a one of the desired trauma treatment programs, while continuing to perform the essential functions of her job.

117.    Stark State College repeatedly denied Plaintiff's reasonable accommodation requests, provided scheduling "alternatives" that facially failed to meet Plaintiff's needs, failed to engage her in a genuine interactive process to discuss alternatives, made unnecessarily burdensome and intrusive medical requests, and refused to explain how Plaintiff's request constituted an undue hardship.

118.    As a direct and proximate result of Defendant's unlawful failure to provide

Plaintiff with a reasonable accommodation, she has suffered severe emotional trauma requiring ongoing treatment and loss of income and benefits.

### Count III
### Title VII
### Retaliation
### Defendant: Stark State

119.    Plaintiff incorporates by reference as if fully set forth herein allegations contained in the preceding paragraphs.

120.    Title VII of the Civil Rights Act prohibits an employer from retaliating against an employee who has "made a charge, testified, assisted or participated in" any charge of unlawful discrimination under the Act. 42 U.S.C. § 2000e 3(a). In order to be legally actionable, the retaliation must be "materially adverse" so as to dissuade the reasonable person from exercising her rights under the statute.

121.    Plaintiff was subjected to continuing and varied forms of unlawful retaliation for reporting sex discrimination. This retaliation included, among other things, continued discrimination, poor performance evaluations, repeated refusals to provide a reasonable accommodation for disability, an unpaid suspension, and termination – followed by an unwarranted 2017 call to local police from Stark State police chief, wrongfully alleging harassment by the Plaintiff. Defendant's acts of retaliation were materially adverse in ways that would dissuade the reasonable person from exercising her rights under these statutes. Furthermore, unable to attack her performance on the merits of her teaching, Stark State College administrators responded to her complaints with a rising crescendo of reprimands alleging violations of internal policies.

122.    As a direct and proximate result of this retaliation, Plaintiff has lost and will continue to lose income, benefits, and other compensation, as well as endure considerable emotional distress and negative health impacts.

### Count IV

**ADA**
**Retaliation**
**Defendant: Stark State**

123.     Plaintiff incorporates by reference as if fully set forth herein allegations contained in the preceding paragraphs.

124.     The Americans with Disabilities Act prohibits retaliation "against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the Act. 42 U.S.C. § 12203(a). In order to be legally actionable, the retaliation must be "materially adverse" so as to dissuade the reasonable person from exercising her rights under the statute.

125.     Plaintiff was subjected to continuing and varied forms of unlawful retaliation for requesting a reasonable accommodation. This retaliation included, among other things, continued refusals to provide a reasonable accommodation for disability, an unpaid suspension, and termination – followed by an unwarranted 2017 call to local police from Stark State police chief, wrongfully alleging harassment by the Plaintiff. Defendant's acts of retaliation were materially adverse in ways that would dissuade the reasonable person from exercising her rights under these statutes.

126.     As a direct and proximate result of this retaliation, Plaintiff has lost and will continue to lose income, benefits, and other compensation, as well as endure considerable emotional distress and negative health impacts.

## VIII.    CLAIMS UNDER 42 U.S.C. §1983

127.     42 U.S.C. § 1983 protects individuals against the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by persons acting under the color of state law.

128.     The following § 1983 claims include denials of procedural due process, substantive due process, freedom from discrimination on the basis of disability and sex, and freedom of speech

24

and association, as detailed, *infra*, with specifically named Defendants included under each claim.

**Count V**
**42 U.S.C. § 1983**
**Procedural Due Process**
**Defendants: Stark State, Jones, Chiappini, Gibson-Shreve, Stephan, Glanz, Torgler,**
**Bittinger, Groh, Griff, Walters, Halm, Stephens, Williams, Maurer**

129.    Plaintiff incorporates by reference as if fully set forth herein allegations contained in the preceding paragraphs.

130.    Defendants Stark State College, Para Jones, Thomas Chappini, Lada Gibson-Shreve, Andrew Stephan, Melissa Glanz, Cathy Torgler, Vicki Bittinger, Kari Groh, Merle Griff, Jeffery Walters, Jeff Halm, Alice Stephens, Fonda Williams, and Chris Maurer, operating under color of state law, failed to provide Plaintiff with her procedural due process rights under the Fourteenth Amendment.

131.    Pursuant to 42 U.S.C. § 1983, A public employee who holds a property interest in retaining employment is entitled to Fourteenth Amendment due process protections when facing termination for cause. This includes a pre-termination hearing, and, in some instances, a post-termination hearing presided over by an impartial decision maker. Additionally, under § 1983, an employee is entitled to oral or written explanation of the charges and evidence against her.

132.    At the time of her 2016 termination, Plaintiff was a public employee with a two-year employment contract "conditioned upon satisfactory performance of [her] job duties," subject to the rules, regulations, policies, and procedures of Stark State College and sufficient budgetary funding by the legislature. Neither Plaintiff's contract nor the Stark State Policies and Procedures Manual included any language referring to her employment status as being at-will. Even Plaintiff's termination letter reiterated that the "College's employment agreements with you are conditioned upon your satisfactory performance of your job duties." Accordingly, plaintiff had a property interest in her continued employment and was entitled to due process.

133.    Stark State administrators repeatedly refused Plaintiff's request for an explanation

of the evidence they intended to use in the due process hearing. On the day of the June 22 due process hearing that led to her termination, when Plaintiff informed Human Resources that she was too sick to attend, Stark State gave her roughly 90 minutes to provide a written response to allegations they had yet to fully share with Plaintiff. Overall, the June 2016 communications between Plaintiff and Human Resources indicate Stark State's desire to move precipitously with her termination, even to the point of conducting the due process hearing in Plaintiff's absence, with no compelling bureaucratic or public safety reason to do so.

134.    As a direct and proximate result of Defendants' unlawful employment practices in disregard for Plaintiff's constitutional due process rights, Plaintiff has suffered severe emotional distress and negative health impacts, and lost and will continue to lose income, benefits, and other compensation.

**Count VI**
**42 U.S.C. § 1983**
**Equal Protection, Freedom of Speech**
**Defendants: Stark State, Jones, Chiappini, Gibson-Shreve, Stephan, Glanz, Groh, Griff, Walters, Halm, Stephens, Williams, Maurer**

135.    Plaintiff incorporates by reference as if fully set forth herein allegations contained in the preceding paragraphs.

136.    Discrimination on the basis of sex and disability is prohibited under the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983.

137.    42 U.S.C. § 1983 also prohibits violations of free speech rights guaranteed by the First Amendment. Public employees have a First Amendment right to speak out on matters of public concern, so long as the speech is neither unduly disruptive nor a part of their official job duties.

138.    Culminating in her termination in July 2016, Plaintiff was subjected to continuing and varied forms of unlawful retaliation for reporting sex and disability discrimination and for exercising her right to free speech with Stark State administrators and trustees. These retaliatory violations of Plaintiff's civil rights culminated in her termination, which was approved, in turn,

26

by president Para Jones and the Stark State trustees.

139.    Accordingly, Defendants, operating under color of state law, denied Plaintiff her rights to equal protection of the law and to freedom of speech, thus in violation of 42 U.S.C. § 1983. As a consequence, she has suffered severe emotional distress and negative health impacts, and lost and will continue to lose income, benefits, and other compensation.

**Count VII**
**42 U.S.C. § 1983**
**Equal Protection**
**Defendants: Stark State, Stephan, Lund**

140.    Plaintiff incorporates by reference as if fully set forth herein allegations contained in the preceding paragraphs.

141.    Discrimination on the basis of disability is prohibited under the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983.

142.    As stated above, Plaintiff experienced childhood sexual, physical, and emotional abuse and has been receiving counseling for Complex PTSD throughout the time covered by this litigation.

143.    Beginning in 2014 and continuing through her termination, Plaintiff made repeated requests for a reasonable accommodation concerning her teaching schedule to dean Andrew Stephan and department chair Danette Lund, which, had it been provided, would have enabled her to participate in one of the trauma treatment programs that she had identified with her physicians. This request was so modest as to be practically *de minimus*, essentially asking that her full-time teaching schedule be identical to those assigned to her in previous semesters, before she even made a reasonable accommodation request.

144.    Plaintiff's requests were denied every time by Defendant Stark State College, without a genuine interactive process to explore alternatives or any explanation of how her requested accommodation constituted an undue hardship.

145.    Accordingly, culminating in Plaintiff's wrongful termination in 2016, Defendants

Stark State College, dean Andrew Stephan, and department chair Danette Lund, operating under color of state law, engaged in a continuing violation of Plaintiff's rights to equal protection under the Fourteenth Amendment, culminating in Plaintiff's wrongful termination, thus in violation of 42 U.S.C. §1983. As a consequence, she has suffered severe emotional distress and negative health impacts, and lost and will continue to lose income, benefits, and other compensation.

### Count VIII
### 42 U.S.C. § 1983
### Freedom of Speech, Religion, and Association, Substantive Due Process, Equal Protection
### Defendants: Stark State, Gibson-Shreve

146.    Plaintiff incorporates by reference as if fully set forth herein allegations contained in the preceding paragraphs.

147.    Starting on May 31, 2016 and continuing through Plaintiff's termination on July 11, 2016, Defendants Stark State College and provost Lada Gibson-Shreve ordered her not to discuss Stark State College business with any of some 3,000 current vendors of the College.

148.    The vast expanse of this list, and individual vendors included within it (public, private, non-profit, media, and faith sector entities and individuals), denied Plaintiff's rights of free speech, association, and religion under the First Amendment.

149.    By prohibiting Plaintiff from discussing Stark State matters with designated lawyers, courts, elected and appointed officials, and administrative agencies, Defendants Stark State and Gibson-Shreve denied Plaintiff her right to equal protection under the law as provided by the Fourteenth Amendment.

150.    Because the extraordinary breadth and depth of this directive had the effect of practically and psychologically isolating Plaintiff from wide swaths of her local community during an especially stressful and acute time, the actions of defendants Stark State and Gibson-Shreve, acting under color of state law, "shock the conscience" as a cruel and arbitrary exercise of governmental power and thus denied Plaintiff's substantive due process rights under the Fourteenth Amendment.

151.     Accordingly, as a direct and proximate result of Defendants' unconstitutional practices and disregard for Plaintiff's rights and dignity, she has suffered severe emotional distress and negative health impacts, and has lost and will continue to lose income, benefits, and other compensation.

**Count IX**
**42 U.S.C. § 1983**
**Equal Protection, Substantive Due Process**
**Defendants: Stark State, Weldon**

152.     Plaintiff incorporates by reference as if fully set forth herein allegations contained in the preceding paragraphs.

153.     In 2015. Plaintiff, fearful for her safety on campus, shared the audio recordings of those assaults that contained her assailant's verbal threats to her with Stark State administrators, including campus security chief Mark Weldon, a former municipal police captain.

154.      In 2017, while Plaintiff's discrimination claims against Stark State were pending before the Equal Employment Opportunity Commission, Weldon contacted the Jackson Township police department and filed a harassment complaint on behalf of the college against Plaintiff. Incredibly, Weldon cited the language of her assailant's audio recorded threats toward her during the 2015 assaults and mischaracterized that language as being the *Plaintiff*'s threats toward Stark State.

155.     Weldon's actions, performed under color of state law, denied Plaintiff's rights to equal protection and substantive due process, thus in violation of 42 U.S.C. § 1983.

156.     Accordingly, as a direct and proximate result of Defendants' unconstitutional practices and disregard for Plaintiff's rights and dignity, she has suffered severe emotional distress and negative health impacts, and has lost and will continue to lose income, benefits, and other compensation.

## IX.  CLAIM UNDER THE EQUAL PAY ACT

**Count X**
**Equal Pay Act, 29 U.S.C. § 206(d)(1)**
**Defendants: Stark State, Chiappini, Glanz**

157.    Plaintiff incorporates by reference as if fully set forth herein allegations contained in the preceding paragraphs.

158.    Section 206(d)(1) of the Equal Pay Act makes it unlawful for an employer "to discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, efforts, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system, (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex."

159.    Defendants employed Plaintiff and Bryan Gerber as full-time college professors requiring substantially similar ability, qualifications, working conditions, and workloads, while continually paying Plaintiff a lower base salary than Bryan Gerber for doing substantially equal work.

160.    Accordingly, Defendants' unlawful conduct violated the Equal Pay Act, and Plaintiff is entitled to all lost income and related benefits.


**X.    PRAYER FOR RELIEF**

Accordingly, Plaintiff Mary Louise Allen prays for relief as follows:

1.    For a declaration that Defendants' actions, policies, and practices as alleged herein are unlawful;

2.    For lost wages and all other compensation denied or lost to Plaintiff by reason of Defendants' unlawful actions, in an amount to be proven at trial;

3.    For compensatory damages for Plaintiff's health care coverage, retirement contributions, and other expenses since her termination, in an amount to be proven at trial;

4.    For compensatory damages for Plaintiff's emotional pain and suffering, in an

amount to be proven at trial;

5.      For punitive damages in an amount to be proven at trial;

6.      For interest on lost wages, compensation, and damages, including pre- and post-judgment interest and an upward adjustment for inflation;

7.      For payment covering tax expenses incurred due to this resolution;

8.      For an order directing Stark State College to change Plaintiff's employment status from that of involuntary discharge to voluntary resignation, effective July 11, 2019;

9.      For an order directing Stark State College to remove reprimands, warning letters, and similar documents from Plaintiff's personnel file, subject to Plaintiff's approval;

10.     For an order directing Stark State College to retroactively revise Plaintiff's personnel evaluations to remove alleged violations of the Policies and Procedures Manual;

11.     For an order directing Stark State College to provide Plaintiff with a positive letter of recommendation and a positive reference on a permanent basis, the text to be subject to Plaintiff's approval;

12.     For an order directing Stark State College, in accordance with the legal claims above, to include letters of reprimand in the personnel files of each named individually employee Defendant, specifying that they denied plaintiff's employment rights, civil rights, and right to equal pay, in violation of the Policies and Procedures Manual;

13.     For an order directing Stark State College to supply Plaintiff with a letter absolving her of any negative findings concerning her alleged harassment of Bryan Gerber;

14.     For an order directing Stark State College to indemnify Plaintiff for any legal claims brought against her in connection with these matters;

15.     For reasonable attorneys' fees and costs of suit;

16.     For an order permitting Plaintiff to present a victim impact statement to the Stark State College community; and,

17.     For such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all causes of action and claims to which she has a right to a jury trial.

Dated: August 6, 2018

Respectfully submitted,

/s/ *David C. Yamada*

DAVID C. YAMADA
*Attorney for Plaintiff Mary Louise Allen*
Admitted Pro Hac Vice (7/5/18 & 7/11/18)
Massachusetts Bar No. 628210

Suffolk University Law School
120 Tremont Street, Suite 260
Boston, MA 02108
Phone: (857) 719-3546
Fax: (617) 573-8143
E-mail: david_yamada@yahoo.com

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(b)(3), I hereby certify that on the 6th day of August, 2018, a copy of the foregoing was served upon Defendants electronically, via their counsel, simultaneously with the electronic filing of this document with the Court:

John N. Childs, Esq.
Daniel J. Rudary, Esq.
BRENNAN, MANNA & DIAMOND, LLC
75 E. Market Street
Akron, OH 44308

/s/ *David C. Yamada*

DAVID C. YAMADA
Suffolk University Law School
120 Tremont Street, Suite 260
Boston, MA 02108
Phone: (857) 719-3546
Fax: (617) 573-8143
E-mail: david_yamada@yahoo.com
Massachusetts Bar No. 628210
*Attorney for Plaintiff Mary Louise Allen*
*Admitted Pro Hac Vice (7/5/18 & 7/11/18)*